602 S.E.2d 382

**In the Matter of Ronald F. BARBARE, Respondent.**

**No. 25843.**

Supreme Court of South Carolina.

Submitted June 10, 2004.

Decided July 20, 2004.

Order Granting Reinstatement July 27, 2004.

Henry B. Richardson, Jr., of Columbia, for the Office of Disciplinary Counsel.

Elizabeth Van Doren Gray, of Sowell, Gray, Stepp & Laffitte, L.L.C., of Columbia, for respondent.

PER CURIAM:

In this attorney disciplinary matter, respondent and the Office of Disciplinary Counsel (ODC) have entered into an Agreement for Discipline by Consent pursuant to Rule 21, RLDE, Rule 413, SCACR. In the agreement, respondent admits misconduct and consents to a definite suspension from the practice of law for a period of not less than four nor more than twelve months. We accept the agreement and definitely suspend respondent from the practice of law in this state for a six month period, retroactive to his interim suspension. The facts, as set forth in the agreement, are as follows.

## *FACTS*

Respondent was admitted to practice law in South Carolina on November 5, 1976. He is a partner in the law firm of Lathan and Barbare (Firm) with his partner Ray D. Lathan (Partner). Respondent and partner are the only two attorneys employed by the Firm.

The Firm's primary practice is the closing of real estate transactions. The Firm handles approximately 1400 to 1600 real estate closings per year.

On or about November 19, 2003, respondent and his partner pled guilty before the United States District Court for the District of South Carolina to one count of violation 18 U.S.C. § 1010, a felony. The information to which respondent pled guilty provided that he falsely certified that he had received cash from borrowers in amounts reported on HUD–1 Settlement Statements he prepared and submitted to the United States Department of Housing and Urban Development when respondent did not receive the cash.

Because of cooperation with federal authorities into matters related to the information and to other investigations, the United States Attorney made a motion for downward departure. Both respondent and his partner received favorable recommendations in the pre-sentencing report submitted by the United States Probation Department. Both respondent and his partner were sentenced to pay a fine of $5,000 as final disposition of their pleas; both have paid those fines.

### Firm's General Procedure for Closing
### Real Estate Transactions

The Firm's paralegal was the principal point of contact between the Firm and the seller. The paralegal reviewed the lender's instructions and the contract of sale and prepared closing documents and a balance sheet showing incoming funds and disbursements. Changes to the transaction were conveyed by the seller to the paralegal who would then make pen and ink changes on the Firm's in-house balance sheet reflecting the changes directed by the seller.

Another Firm employee then prepared checks for disbursement in accordance with the balance sheet, including any pen and ink changes prepared by the paralegal. Thereafter, the employee prepared a class report showing the disbursements made out of the Firm's trust account in connection with each transaction.

Respondent or his partner reviewed the various closing documents, attended the closing with the seller and borrower, and gave instructions to the Firm staff for the conclusion of transactions. Respondent or his partner attended and supervised all closings.

Generally, there were no direct communications between the Firm and the borrowers prior to closing. In general, neither respondent nor his partner had any communications with the seller concerning an individual transaction prior to closing.

### Cromer Company Transactions

Respondent and his partner served as closing attorneys in a number of real estate transactions where the Cromer Company was the seller of mobile home and land packages. The principal owner of the Cromer Company was A. Eugene Cromer (Cromer). Melissa Caldwell (Caldwell) was an employee of the Cromer Company and was often the principal point of contact between the Cromer Company and the Firm.

On approximately four occasions, respondent closed loans for the Cromer Company where the HUD–1 Settlement Statements reflected that certain sums of money on line 303 "cash from borrower" had been paid by borrowers at closing when

the balance sheet (in-house schedule of incoming funds and disbursements) and the Firm's class report (trust account ledger) showed no money had been received into the Firm's trust account. On these occasions, no money was received by the Firm from borrowers.

Respondent represents that Cromer or a representative of his company advised the Firm staff, probably the paralegal, that this amount had been paid by borrowers directly to the Cromer Company. Thereafter, the paralegal made pen and ink changes to the balance sheet to reflect that no "cash from borrowers" was received at closing and reduced the "cash to seller" on line 603 of the HUD-1 statements by the amount of the "cash from borrower" shown on line 303.[1] However, the HUD-1 forms submitted to the lenders were not amended and continued to show an amount of "cash from borrower" on line 303 and no notation of "POC" (a standard abbreviation for "paid outside of closing"). The HUD-1 forms contained the standard statement signed by respondent to the effect "the HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused the funds to be disbursed in accordance with this statement." The HUD-1 forms were forwarded to the lenders as originally drafted, without the pen and ink changes noted on the balance sheets.

Respondent is now informed and believes that the representations from the Cromer Company that the amount "due from borrower" in these transactions occasions had been paid directly by borrowers to the Cromer Company were false, that there was (at least in most instances) no money paid from the borrowers as represented on line 303 of the HUD-1 forms and that Cromer's misrepresentations were in furtherance of his scheme to sell mobile home and land packages to borrowers without the borrowers having to contribute any money to the transactions. As a result, it now appears that the representations made by respondent concerning the information on lines 303 and 603 of the HUD-1 statements were incorrect. The inaccurate report had the tendency to cause lenders to believe that borrowers had invested money in the transactions when,

---

1. In the lending business, this technique is referred to as "shorting the seller."

in fact, the borrowers had not, and caused the price of the package to be inflated by the amounts shown on line 303 of the HUD–1 forms.

Cromer and Caldwell were indicted in the United States District Court in connection with one or more transactions closed by the Firm where the Cromer Company was the seller. An allegation in Cromer's indictment states Cromer made false statements concerning down payments (information on line 202 of HUD–1 forms) and "cash from borrowers" (information on line 303 of HUD–1 forms). Cromer pled guilty to one count of mail and wire fraud in connection with these transactions and was sentenced to eighteen months in prison. In his plea agreement, Cromer admitted he had derived between $5,000,000 and $10,000,000 in benefits from his scheme.

ODC does not contend that either respondent or his partner were aware of Cromer and Caldwell's criminal activities or of the amount of the money involved. Instead, ODC contends respondent's failure to either amend line 303 and line 603 to reflect "no cash from borrower" received by the Firm or to place the notation "POC" by the line 303 data made it possible for Cromer to engage in the criminal activity stated in the Cromer indictment.

In approximately twelve transactions in which the Cromer Company was the seller and the Firm served as closing agent, borrowers made claims or, in some cases, initiated litigation, against the Firm. The Firm and/or respondent and his partner and their insurance carrier paid $2,500 per case to settle the claims.

## Stegall Entities Transactions

For many years, the Firm handled numerous real estate transactions for several entities owned and managed by Donald L. Stegall (Stegall). Respondent served as closing attorney in approximately nineteen transactions where Stegall entities were the sellers of mobile home and land packages.

In each of these nineteen transactions, the HUD–1 statements and Firm balance sheets were prepared by the Firm's paralegal based on information from contracts of sale, information in the lender's loan closing instructions, and/or instruc-

tions from Stegall employees, usually Teresa Ashmore (Ashmore). In each of the transactions, both line 303 on the HUD–1 statement and the balance sheet would initially reflect amounts of money to be paid by the borrower at closing. Prior to closing, Ashmore would instruct the paralegal to make changes, primarily reducing the amount of "cash from borrower" to zero and making corresponding reductions in "cash to seller" on line 603 and, in other cases, directing other changes in disbursements to Stegall entities to cause the disbursements to balance.

The changes made by the paralegal at Ashmore's directions were not reflected on the HUD–1 forms which were sent to the lenders. In each of these transactions, the HUD–1 statement contained a certification signed by respondent, as settlement agent, to the effect "the HUD–1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused the funds to be disbursed in accordance with this statement." None of the nineteen settlement statements contained the notation "POC" beside line 303 "cash from borrower" even though this amount was not received by the Firm. Accordingly, there was a variance in the information furnished to the lenders on the HUD–1 statements and the actual disbursements made out of the Firm's trust account in connection with these transactions.

In thirteen of the Stegall closings, addendums to the HUD–1 statements were prepared by the Firm's staff and executed by the parties. The effect of the addendums was to reduce to writing the changes which had been directed by Stegall employees, usually Ashmore, and made to the balance sheet by the paralegal. The addendums were not sent to the lenders.

In one Stegall transaction, respondent closed loans for Borrower F. Because the transaction was insured by the Federal Housing Administration (FHA), an FHA Addendum was required. The borrower and seller signed certifications on the FHA Addendum presented by respondent stating that there had not been any reimbursement for any cash down payment or closing costs not disclosed to the lender. Respondent signed the certification on the FHA required addendum that the HUD was " . . . a true and accurate account of the funds that were (i) received or (ii) paid outside of closing, and

the funds received have been or will be disbursed by [respondent] as part of the settlement of this transaction."

The HUD-1 statement sent by respondent to the lender also contained the standard certification signed by respondent as the settlement agent. The HUD-1 statement sent to the lender showed $6,955.67 "cash from borrower," however no cash from borrower was received by respondent or the Firm in connection with the transaction and the amount actually paid to the seller was reduced by the amount "due from borrower." As a result, there was a variance in the information furnished the lender on the HUD-1 statement and the FHA required addendum and the actual disbursements, made from the Firm's trust account and this, in turn, caused respondents' certifications to be incorrect.

Many of the transactions handled by the Firm for the Stegall entities were funded by Cendant Mortgage Corporation (Cendant). Jeffrey L. Greene (Greene) was Cendant's local representative and was the usual point of contact between the Firm and Cendant. Respondent was aware that Greene was also the principal point of contact between the Stegall entities and Cendant. Respondent knew Greene approved financing for borrowers of mobile home and land package sales made by Stegall entities.

On May 17, 2000, respondent closed a real estate transaction for Seller H to Buyer L involving real property at 13 Hillside Circle in Greenville. Respondent knew that Buyer L was a former employee of Stegall or a Stegall entity. The HUD-1 statement reflected the sales price as $55,000 and the "cash from borrower" being $55,531.12.

The same day, respondent closed another transaction where Buyer L sold the same property to Greene. This second transaction was funded by a lender other than Cendant. The HUD-1 statement in this transaction reflected a sales price of $80,000 and "cash from borrower" (Greene) as $11,735.77. An addendum to the settlement statement, signed by respondent, stated "cash to seller" was reduced by the exact amount of "cash from borrower."

According to the class report, the loan proceeds from the lender in the second transaction were the only funds received by respondent for both transactions. A Firm check in the

amount of $55,531,12—paid out of the second transaction—represented the "cash from borrower" due in the first transaction.

The above activities on May 17, 2000, are known as a "flip transaction" where proceeds from the second transaction are used to fund the initial transaction. For the HUD–1 statement in the first transaction to have been accurate, the "cash from borrower" should have been $0 and the $55,531.12 should have been shown under "amounts paid by or on behalf of borrower" under a line in the 200 column of the HUD form.

For the HUD–1 statement in the second transaction to have been accurate, the $55,531.12 and the $11,735.77 (the amount the seller gave Greene) should have been shown under "reduction in amount due seller" under a line in the 500 column of the HUD and the "cash to seller" reduced to $11,987.24 which was the amount disbursed to seller. On this HUD–1 form, the "cash from borrower" should have been shown as $0 because Greene paid no cash at the closing.

The flip transaction allowed Greene to acquire the property using only the proceeds from the loan notwithstanding the fact that the HUD–1 sent to the lender indicated Greene had contributed $11,735.77 to the transaction. In effect, the seller (original Buyer L) simply gave Greene $11,735.77.

All of the foregoing resulted in the information furnished to the lender in the second transaction to be at variance with the disbursements actually made from the Firm's trust account as reflected on the class report. In addition, the lender was not provided with a copy of the addendum to the settlement statement.

On January 5, 2001, respondent served as the closing attorney in a transaction whereby Greene purchased real property at 109 Pine Ridge Lane in Greenville from a Stegall entity. The transaction was financed by a lender other than Cendant.

The HUD–1 form reflects earnest money or a deposit of $6,616.03 on line 201 and "cash from borrower" of $5,954.13. Line 603 reflects "cash to seller" of $79,683.97. However, respondent had the parties sign an addendum showing "credit to buyer" of $13,300, and a corresponding reduction of the amount due seller, resulting in "cash due to buyer" of

$7,345.87. The Firm's class report reflects that the only deposit into the Firm's trust account in connection with this transaction were the loan proceeds. The class report shows a refund to Greene of $7,345,87 (paid by a check in the amount of $6,345.87 and the withholding of a $1,000 judgment lien). Consequently, Greene, the buyer, (who is shown on the HUD–1 form as contributing $5,954.13 to the transaction) received $7,345.87. The HUD–1 form was submitted to the lender without being amended to conform to the balance sheet and actual disbursements. The addendum was not submitted to the lender.

On January 30, 2001, Greene purchased real property at 116 Blackbird Lane in Greenville. The mobile home was purchased from LUV Homes and the land from a Stegall entity. Respondent served as the closing attorney. A lender other than Cendant financed the transaction.

The HUD–1 furnished to the lender reflects "cash from borrower" on line 303 as $13,268.56 and "cash to seller" on line 603 as $84,700. The sales price of the lot is shown on the HUD–1 form.

However, LUV Homes and respondent signed an addendum that shows a credit to Greene as "funds from seller" of $25,031.44, reducing the "due seller" by a like amount, resulting in the "due to borrower" to be $11,762.44. A second addendum for the lot sale shows the sales price of the lot reduced by a release fee, payoff, and closing costs. The Firm's balance sheet and class report show a disbursement to Greene of $11,762.44 and reflect that the only deposit was for the loan proceeds. The class report reflects a disbursement of $9,312.00 to Twin Lakes, a Stegall entity, notwithstanding the fact that this entity is not mentioned anywhere on the HUD–1 form. This amount was shown on the second addendum which accounted for the funds on the lot sale.

On January 2, 2001, respondent served as the closing attorney in a transaction whereby Sellers H and W sold property at 4008 Shady Grove in Honea Path to Buyer B. The HUD furnished to the lender, Cendant, shows $4,000 in earnest money on line 201, "cash from borrowers" of $960.55, and "cash to seller" of $11,261.53. However, the Firm's file contains two letters addressed to respondent. One of these

letters, signed by Sellers H and W, states ". . . disburse all the net proceeds . . . to . . . Buyer B omitting our names." The second letter addressed to respondent is from Buyer B instructing respondent ". . . disburse the net proceeds in the approximate amount to [Greene] omitting my name." Respondent did not furnish either of these letters to Cendant. Contrary to the information on the HUD–1 furnished to Cendant as lender, the class report shows respondent did not receive the $960.55 from the borrower. The class report also shows a disbursement to Greene, notwithstanding the fact that Greene's name appears nowhere on the HUD–1 form and that he has no apparent relationship to the transaction.

At some point, respondent became concerned whether borrowers were making the "cash from borrower" payments directly to the Stegall entities. Accordingly, respondent began requiring presentation of a cashier's check for the "cash for borrowers" at closings. Respondent handled approximately five transactions in which he required cashier's checks. The cashier's checks were usually prepared by BB & T (where respondent knew the Stegall entities banked) and delivered by Stegall employees to respondent's staff. Respondent is now informed and believes the Stegall entities furnished the money to purchase the cashier's checks, but this was not known by respondent until it came to light during discovery in the Cendant case. *See infra.*

Greene was indicted. He pled guilty in the United States District Court to one count of wire fraud and was sentenced to five years probation and restitution in connection with fraudulent dealings with Stegall and Ashmore to the detriment of Cendant and other lenders who purchased loans with inflated property values. In his plea agreement, Greene admitted deriving between $1,500,000 and $2,500,000 from his scheme with Stegall and Ashmore.

With information available from criminal proceedings and related civil litigation after the closings, it now appears that the accommodations in the foregoing transactions by Stegall entities to Greene were in return for Greene inducing Cendant to make loans on inflated mobile home and/or land packages to borrowers who were buying from Stegall entities. Respon-

dent was unaware of Stegall and Greene's arrangement concerning the Cendant loans.

Stegall and Ashmore were also indicted in the United States District Court in connection with defrauding lenders in conspiracy with Greene. Stegall pled guilty to one count of wire fraud and was sentenced to eighteen months in prison. In his plea agreement, Stegall admitted deriving $3,075,000 from the real estate transactions related to his plea. One or more of the transactions mentioned in the information to which Stegall pled guilty were closed by the Firm.

As a result of the foregoing, Cendant initiated litigation against the Firm. Cendant was paid $750,000 as settlement on behalf of the Firm. Five hundred and seventy five thousand dollars of this amount was paid by the Firm's insurance carrier and the remainder was paid by the Firm or respondent and his partner.

### Additional Facts

ODC's investigation reveals respondent did not receive any special financial benefit from the closings investigated by ODC. All fees received are shown on the Firm's class report; the fees appear to be reasonable and customary for work of this type in Greenville.

ODC does not allege respondent deliberately sought to assist Cromer, Caldwell, Stegall, Ashmore, or Greene in criminal undertakings or had knowledge of their criminal intent. However, submitting HUD–1 Settlement Statements to lenders which were at variance with receipts and disbursements from the Firm's trust account enabled these people to break the law. With the advantage of hindsight and discovery of criminal activity, respondent now recognizes there were "red flags" which should have alerted him that the Cromer Company and the Stegall entities were seeking to mislead lenders, particularly in closing transactions where Stegall entities effectively gave money to Greene who was originating loans from Cendant to borrowers purchasing mobile home and land packages from Stegall entities. ·

It now appears that in many of the mobile home and land package transactions respondent closed for the Cromer Company and the Stegall entities, borrowers paid no money into

the transactions. Instead, these sellers were seeking to close the transactions without the borrowers contributing their own money as an inducement for borrowers to close the transactions with their businesses. This information was not known to respondent until after the closing of all of these transactions.

## *LAW*

Respondent admits that by his misconduct he has violated the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 1.1 (lawyer shall provide competent representation to client); Rule 1.2(e) (when lawyer knows client expects assistance not permitted by the Rules of Professional Conduct or other law, lawyer shall consult with the client regarding the relevant limitations on the lawyer's conduct); Rule 4.1(a) (in the course of representing a client, lawyer shall not knowingly make a false statement of material fact or law to a third person); Rule 4.1(b) (in the course of representing a client, lawyer not fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6); Rule 5.1(a) (partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the Rules of Professional Conduct); Rule 5.3(b) (with respect to a nonlawyer employee, lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with professional obligations of the lawyer); Rule 8.4(a) (lawyer shall not violate Rules of Professional Conduct); Rule 8.4(b) (lawyer shall not commit criminal act that reflects adversely on lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects); Rule 8.4(d) (lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation); and Rule 8.4(e) (lawyer shall not engage in conduct that is prejudicial to administration of justice). In addition, respondent admits his misconduct constitutes a violation of Rule 7, RLDE, of Rule 413, SCACR, specifically Rule 7(a)(1) (lawyer shall not violate Rules of Professional Conduct or any other rules of this jurisdiction regarding professional conduct of lawyers), Rule 7(a)(4) (lawyer shall not be convicted of

crime of moral turpitude or serious crime); and Rule 7(a)(5) (lawyer shall not engage in conduct tending to pollute the administration of justice or to bring the courts or the legal profession into disrepute or conduct demonstrating an unfitness to practice law).

## *CONCLUSION*

We accept the Agreement for Discipline by Consent and definitely suspend respondent from the practice of law for a six month period, retroactive to the date of his interim suspension. Within fifteen days of the date of this opinion, respondent shall file an affidavit with the Clerk of Court showing that he has complied with Rule 30, RLDE, Rule 413, SCACR.

The Court is troubled by the recent number of real estate transactions which have been the subject of misleading, fraudulent, and/or criminal schemes. Inaccurate HUD–1 Settlement Statements and other closing documents contribute to these deceptive activities. Respondent's misconduct derives principally from his inaccurate representations on HUD–1 Settlement Statements. These misrepresentations have subjected respondent to both federal criminal penalties and the current disciplinary action by this Court.

In addition to completing HUD–1 Settlement Statements, attorneys prepare their own settlement statements. These documents, too, must also correctly reflect the underlying financial transaction by the parties in order for the buyer, seller, and others to have an accurate record of the transaction.

According to the parties in this matter, a large number of attorneys are not passing closing funds through their trust accounts and, at the same time, not identifying the funds as paid outside of closing on closing documents. Not only does this practice fail to accurately record the actual transaction for the buyer and seller, but it is misleading to lenders. In an attempt to eliminate this and other deceptive practices, we emphasize that costs and credits in connection with a real estate transaction must be shown on the settlement statement and that the settlement statement must reflect all amounts paid, by whom paid, and to whom paid. Any charges

574

or amounts paid outside of the closing must be reflected as such on the settlement statement (i.e., "POC"). For all funds exchanged during the closing, the attorney must have a record of the method of payment by the parties to the transaction, as well as an accounting of all receipts and disbursements by the attorney. The attorney's records must accurately reflect the transaction as evidenced by the settlement statement unless there is written documentation signed by all parties to the transaction (including any lender) indicating that funds were disbursed otherwise. Failure to comply with these standards may subject attorneys to disciplinary action.

**DEFINITE SUSPENSION.**

TOAL, C.J., MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.

### ORDER

Respondent was suspended on July 20, 2004, for a period of six months, retroactive to December 4, 2003. He has now filed an affidavit requesting reinstatement pursuant to Rule 32, of the Rules for Lawyer Disciplinary Enforcement contained in Rule 413, SCACR.

The request is granted and he is hereby reinstated to the practice of law in this state.

/s/ Jean H. Toal, Chief Justice

/s/ Daniel E. Shearouse
Clerk